UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

PATRICK MENDEZ, on behalf of himself and
all other employees similarly situated,


                                    Plaintiffs,

                                                        DECISION AND ORDER

                                                        03-CV-6342L


                    v.

THE RADEC CORPORATION, et al.,



                                    Defendants.
_____


        Plaintiff, Patrick Mendez, commenced this action against his former employer, Radec

Corporation ("Radec"), and two of its officers, alleging that Radec has violated the Fair Labor

Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and the New York Labor Law ("Labor Law"), for

failure to pay wages to which Mendez was legally entitled.   Mendez also alleges that Radec

terminated his employment in retaliation for his complaints about Radec's wage violations.

        On February 26, 2004, the Court denied without prejudice Mendez's motion under Fed. R.

Civ. P. 23 to certify a class on his state law claims consisting of "all individuals who are or were

employed by Radec, including all affiliated Radec agencies, within the last three years at any location

in New York State" and who fell into one of several subclasses, including employees who did not

receive overtime pay, promised per-hour increases, promised bonuses, pay for work-related travel,

or travel expenses.   The Court also granted Mendez's motion for an order directing that potential

class members be given notice of the existence of this action and of their rights to opt in to the action under the FLSA's "collective action" provision, 29 U.S.C. § 216(b). To date, seventy-six individuals have opted into this action.

Plaintiffs have now filed a motion for summary judgment on the claims of certain subclasses in this action, and have also renewed the motion for class certification of the Labor Law claims under Rule 23. Defendants have moved for an order "decertifying" the FLSA collective action, and dismissing all putative plaintiffs' FLSA claims without prejudice to the filing of individual FLSA actions.

## BACKGROUND

The complaint alleges that Radec, a company engaged in the business of commercial electrical construction and maintenance, has routinely failed to pay its employees certain wages due its employees, in a number of ways.[1] For instance, plaintiffs allege that Radec has promised employees that they would receive increases (typically $1 to $3 per hour) in their per-hour pay to induce those employees to work on particular jobs. Similarly, Radec has allegedly promised employees daily bonuses (usually between $20 and $40 per day) to work at certain job sites. Plaintiffs allege that Radec has failed to make those promised payments.

Plaintiffs also allege that Radec has failed to pay statutorily-required overtime pay (or any pay at all) for hours worked in excess of 40 hours per week. *See* 29 U.S.C. § 207(a)(1) (providing

---

[1]All references to the complaint are to the amended complaint (Dkt. #111).

that in general, hourly employees who work in excess of 40 hours per week must be compensated for the excess hours at a rate not less than 1½ times their regular hourly wage).  In other words, employees were allegedly required to work some hours "off the clock."  Plaintiffs also allege that Radec has failed to compensate employees for certain time spent traveling to out-of-town job sites when such pay was statutorily required.  In addition, plaintiffs allege that Radec has failed to keep certain records required by the FLSA and the Labor Law.[2]

Based on these allegations, plaintiffs assert causes of action under the FLSA and Labor Law, alleging that defendants have violated their obligations under those statutes.  Plaintiffs also assert nine causes of action under New York common law.  Plaintiffs seek injunctive relief, compensatory and liquidated damages, and attorney's fees.

## DISCUSSION

### I. Plaintiffs' Motion for Summary Judgment

Plaintiffs have moved for "partial" summary judgment as to four subclasses of plaintiffs, all of whose claims focus on defendants' failure to pay regular and overtime pay at the rates required by law, and on defendants' failure to maintain appropriate records.  As denominated in the complaint, these consist of subclasses: 2A, which is composed of class members "who were suffered or permitted to work hours and were not compensated for that time at regular or overtime rates by defendants as required by law," Complaint ¶ 39; 2B, consisting of all class members who were

---

[2]Mendez also asserts a claim of unlawful retaliation on his own behalf only.  Neither side has moved with respect to that claim.

"suffered or permitted to travel to locations at which an overnight stay was expected, or [who] traveled for special one-day assignments, and were not compensated for that travel by defendants as required by law," Complaint ¶ 40; 2C, made up of all class members "who were promised wages including a per-hour increase, were suffered or permitted to work, and whose statutorily required regular and overtime rate of pay was not calculated to include those increases," Complaint ¶ 41; and 2D, comprising all class members "who were promised a daily bonus, were suffered or permitted to work, and whose statutorily required regular and overtime rate of pay was not calculated to include the daily bonus," Complaint ¶ 42.  The particular claims on which plaintiffs seek summary judgment will be examined in turn.

## A. Payment for Lunch Breaks

Plaintiffs allege that Radec automatically deducts two and a half hours from each employee's pay each week to reflect thirty minutes' lunch time each day.  For example, if an employee worked Monday through Friday from 8:00 a.m. to 4:30 p.m., the employee would be paid for 40 hours, not 42.5 hours, based on the expectation that the employee had taken 30 minutes a day for lunch. Plaintiffs contend that by defendants' own admission, this was done regardless of whether the employee's lunch break had been interrupted by work duties, which plaintiffs allege happened frequently.

The employer's obligations concerning meal periods is covered at 29 C.F.R. § 785.19(a), which provides that

> [b]ona fide meal periods are not worktime.  Bona fide meal periods do not include coffee
> breaks or time for snacks.  These are rest periods.  The employee must be completely

relieved from duty for the purposes of eating regular meals.  Ordinarily 30 minutes or more is long enough for a bona fide meal period.  A shorter period may be long enough under special conditions.  The employee is not relieved if he is required to perform any duties, whether active or inactive, while eating.  For example, an office employee who is required to eat at his desk or a factory worker who is required to be at his machine is working while eating.

Section 785.19(b) also provides that "[i]t is not necessary that an employee be permitted to leave the premises if he is otherwise completely freed from duties during the meal period."

Plaintiffs interpret this regulation to mean that an employer may not deduct the time spent on a meal period unless the employee received an *uninterrupted* 30-minute or longer period for the meal.  Any work-related interruption in that period, according to plaintiffs, renders the entire meal period compensable.

Defendants disagree both with plaintiffs' version of the facts and with plaintiffs' interpretation of the law.  According to defendants, all Radec employees are required to take at least a 30-minute lunch break, but if for some reason an employee skips his lunch break, Radec does not deduct 30 minutes from his pay.  Defendants also contend that employees are given flexibility about when to take their break, and, therefore, they can use it to leave for the day a half hour early.  Employees are not required to remain at the job site during lunch, and only a half hour is deducted from employees' pay, even if they take longer than that for lunch.

Defendants also assert that work-related interruptions during lunch are rare.  When they do occur, defendants state, they are typically caused by deliveries of tools or supplies from Radec or from other suppliers, neither of whom would typically make deliveries during lunchtime.  On those occasions when deliveries were made during lunch, the electricians at the site would either:  not be needed to assist at all; need no more than a few minutes to help with the delivery; or, for large

deliveries, stop their lunch entirely, help unload the delivery truck, and then restart their lunch, so that they still took a total of at least 30 minutes for lunch.

Defendants also state that occasionally, someone from the Radec office might call a work site to check on the status of the job or to discuss some other matter. Such calls, however, were generally brief. If for some reason an employee was unable to take a full 30 minutes for lunch, according to defendants, he would be allowed to take a break later, leave early, or be compensated for the part of the break that he missed.

Defendants also take issue with plaintiff's interpretation of 29 C.F.R. § 785.19(a). Defendants contend that the case law does not support plaintiffs' literal reading of the regulation, and that an occasional, brief interruption of an employee's lunch period does not render the entire period compensable.

After reviewing both sides' submissions, I conclude that defendants' interpretation of § 785.19 is the correct one. I also conclude that there are genuine issues of fact that preclude the entry of summary judgment in plaintiff's favor on this claim.

In *Reich v. Southern New England Telecommunications Corp.*, 121 F.3d 58 (2d Cir. 1997), the Court of Appeals for the Second Circuit endorsed a "'practical,' and thus implicitly flexible," approach to construing § 785.19." *Id.* at 64. Using that approach, the court stated that "§ 785.19 must be interpreted to require compensation for a meal break during which a worker performs activities predominantly for the benefit of the employer." In so ruling, the court expressly rejected a literal reading of the regulation as requiring employees to be completely removed from duty throughout their meal periods. *Id.* at 65. *See also id.* at 64 (quoting a Department of Labor letter

stating, "[W]e would not consider infrequent interruptions of short duration ... as nullifying the exclusion of an otherwise bona fide meal period from compensable hours of work").

This standard has also been adopted by a majority of other federal courts. *See*, *e.g.*, *Roy v. County of Lexington, South Carolina*, 141 F.3d 533, 544 (4th Cir. 1998) (stating that "the most appropriate standard for compensability is a 'flexible and realistic' one where we determine whether, on balance, employees use mealtime for their own, or for their employer's benefit"); *Bernard v. IBP, Inc. of Nebraska*, 154 F.3d 259, 264-65 (5th Cir. 1998) (noting that "courts have employed a 'predominant benefit test'" for determining whether meal periods are compensable); *Hill v. United States*, 751 F.2d 810, 815 (6th Cir. 1984) (district court correctly concluded that plaintiff was not entitled to compensation for his meal period, since evidence showed that any work-related interference with his meal period was purely *de minimis*), *cert. denied*, 474 U.S. 817 (1985); *Alexander v. City of Chicago*, 994 F.2d 333, 337 (7th Cir. 1993) (applying predominant-benefit test to police officers' FLSA claim for compensation for lunch breaks), *cert. denied*, 520 U.S. 1228 (1997); *Henson v. Pulaski County Sheriff Dep't*, 6 F.3d 531, 534 (8th Cir. 1993) (adopting predominant-benefit standard, and commenting that "We find it unrealistic to hold that an employer must compensate employees for all meal periods in which the employee is relieved of all duties except simply remaining on-call to respond to emergencies"); *Lamon v. City of Shawnee, Kansas*, 972 F.2d 1145, 1155 (10th Cir. 1992) (an "employee is considered to be completely relieved from duty during a meal period when the employee's time is not spent predominantly for the benefit of the employer"), *cert. denied*, 507 U.S. 972 (1993).

These cases make plain, then, that not every interruption of an employee's lunch break renders the entire break period compensable under the FLSA.  The question is not whether an employee did *any* work at all during his meal period, but whether that period itself is used primarily to perform activities for the employer's benefit.

Plaintiffs apparently read *Reich*'s reference to a "meal break during which a worker performs activities predominantly for the benefit of the employer" as meaning a break in which the worker performs *any* activities that are predominantly for the employer's benefit.  Such an interpretation would amount to a literal reading of § 785.19's "completely relieved from duty" language, an approach that the Second Circuit explicitly rejected in *Reich*.  *See Reich*, 121 F.3d at 58 ("To the extent that the Secretary advocates a literal reading of § 785.19, ... we decline to follow this construction"); *see also Summers v. Howard Univ.*, 127 F.Supp.2d 27, 33 (D.D.C. 2000) (citing *Reich* as among the majority of courts, which use the predominant-benefit standard, and noting that "[r]elying more literally on the language in the ... regulations, a *minority* of circuits have held that an employee engages in work during meal periods unless he is *completely* relieved from duty") (emphasis added) (citations omitted).

Case law subsequent to *Reich* also makes clear that the relevant question is whether the break itself is predominantly spent on activities for the employer's benefit, not on whether the employee did anything at all for the employer's benefit.  *See, e.g., Bernard*, 154 F.3d at 264-65 and n. 16 (citing *Reich* with approval and stating that "[t]he critical question is whether the meal period is used predominantly or primarily for the benefit of the employer or for the benefit of the employee"); *Roy*, 141 F.3d at 544 ("although § 785.19(a) can be read to require that an employer may only exclude

meal periods from compensation if it permits an employee to cease all duties of any kind during such periods, the Secretary [of Labor] did not seemingly intend such a broad construction"); *Hill*, 751 F.2d at 815 ("It is only when an employee is required to give up a substantial measure of his time and effort that compensable working time is involved"); *Harris v. City of Boston*, 253 F.Supp.2d 136, 144 (D.Mass. 2003) ("the majority of the Circuits that have had occasion to address the issue have rejected the 'completely relieved from duty' test in favor of the 'predominantly for the benefit of the employer' test when determining whether meal periods are considered 'hours worked.' Using this test, meal periods are considered 'work' only when an employee predominantly spends the time performing activities for the employer's benefit"). Adopting plaintiffs' position, then, would hardly be consonant with the Second Circuit's endorsement of a "practical" and "flexible" approach. *Reich*, 121 F.3d at 64.

As stated earlier, though, I find that the Court cannot decide, on the record before me, whether, or to what extent, plaintiffs' meal periods were subject to work-related interruptions of such frequency and magnitude as to make them compensable under the predominant-benefit standard. The parties' versions of the relevant facts, as set forth in their affidavits, differ sharply from each other, and the Court cannot resolve those differences without weighing the affiants' credibility, which would be inappropriate on a motion for summary judgment. *See Curry v. City of Syracuse*, 316 F.3d 324, 333 (2d Cir. 2003) ("It is well established that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment'") (quoting *Fischl v. Armitage*, 128 F.3d 50, 55-56 (2d Cir. 1997)).

- 9 -

For example, plaintiffs have submitted an affidavit of Duffy Boatfield, who worked for Radec as an electrician from 1997 to 1999. He estimates that "about 35% of [his] lunches were interrupted at least in part by work," that defendants were aware of the interruptions, and that they instructed him always to deduct a half hour for lunch. Dkt. #137 ¶¶ 21, 22. He also states that about 15% of the time, he took no lunch break at all because he needed to continue working on a project, but he was still told to record a half hour for lunch. *Id.* ¶¶ 27, 28.

Other current and former Radec employees have made similar allegations, although the numbers vary from employee to employee. Some of the alleged interrupted and missed lunch breaks are quite substantial; in fact, two former employees, David Gibson and David Hardy, allege that about 100% of the time, either their lunch breaks were interrupted, or they took no lunch break at all. Dkt. #141 ¶¶ 42, 47; Dkt. #142 ¶¶ 38, 42. Again, they claim that they were nevertheless required to deduct a half hour from their time.

Raymond Shortino, President of Radec, on the other hand, states in an affidavit that "Radec does not automatically deduct a half-hour lunch from an employee's paycheck each week," Dkt. #156 ¶ 25, and that if for some reason an employee skips his lunch period, "Radec will compensate that employee for the time." *Id.* ¶ 29. He also states that Radec's electricians often take *more* than thirty minutes for lunch, but are still required to deduct only a half hour when that occurs. *Id.* ¶ 30.

Shortino also states that it is rare for an employee's lunch to be interrupted by work-related matters, and that when such an interruption does occur, "the employee [is] allowed to increase his lunch break correspondingly." *Id.* ¶ 34. He adds that if for some reason an employee does not get

a full half hour for lunch, he may take a break later that day, leave early, or be compensated for the that part of the break that was missed.  *Id.* ¶ 36.

Defendants have also submitted affidavits by some Radec employees corroborating Shortino's assertions.  For example, Nick Anschutz, an apprentice electrician who has worked at Radec since 2000, states that he "ha[s] never worked through a lunch without compensation," that "[l]unch breaks are very rarely interrupted," and that his and other employees' lunch breaks typically last longer than thirty minutes.  Dkt. #157 ¶¶ 11-20.  Other Radec employees have submitted affidavits containing similar assertions.

If it is determined that lunch breaks were rarely interrupted and only for brief periods, then no compensation would be required.  Given the stark contrast, though, between the parties' versions of the relevant facts, the Court cannot decide, on a motion for summary judgment, where the truth lies.  "The Court's role in summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'"  *Lashley v. Wakefield*, 367 F.Supp.2d 461, 465 (W.D.N.Y. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  Specifically, I cannot decide as a matter of law how often Radec employees' meal periods have been interrupted by work-related matters, or the typical duration of such interruptions, and I therefore cannot determine whether or how often those periods have been spent predominantly for the benefit of Radec.  *See Reich*, 121 F.3d at 64 (noting that "the determination of what constitutes work is necessarily fact-bound") (citing *Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944)); *Bernard*, 154 F.3d at 266 (stating that "[w]hen applying this [predominant-benefit] test, the courts have focused upon the limitations and restrictions placed upon the employees, the extent to which

those restrictions benefit the employer, the duties for which the employee is held responsible during the meal period, and the frequency in which meal periods are interrupted") (footnote omitted). Likewise, I cannot determine, without improperly assessing the credibility of the affiants, whether Radec employees have been required to deduct a half hour for lunch even when work duties prevented them from taking any lunch at all.

In their reply brief, plaintiffs rely on the rule that, once an FLSA plaintiff has made out a *prima facie* case that he "ha[s] in fact performed work for which [he was] improperly compensated and produce[d] sufficient evidence to show the amount and extent of that work 'as a matter of just and reasonable inference[,] ... the burden shifts to the employer, and if the employer fails to produce evidence of the 'precise amount of work performed' or evidence to 'negative the reasonableness of the inference to be drawn from the employee's evidence,' the court may then 'award damages to the employee[s], even though the result be only approximate.'" *Reich*, 121 F.3d at 67 (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946)).  Plaintiffs contend that defendants have not come forward with evidence demonstrating the precise amount of work actually performed by plaintiffs, and that plaintiffs' sworn statements concerning the hours they worked must be accepted as true.

The problem here, however, is not simply in determining how *many* additional hours plaintiffs should be compensated for; it is in deciding whether they are entitled to additional compensation *at all*.  According to plaintiffs, their lunch breaks were interrupted, or not taken at all, virtually without fail.  According to defendants, interruptions were rare and usually brief, and Radec employees are always compensated for whatever time they work.  In fact, according to defendants,

many employees are *over*compensated in the sense that their pay is only deducted for a half hour's lunch each day, even though many employees take longer than that for lunch. This is not simply a question of adequate time records, then, but of the existence of an FLSA violation in the first place.


**B. Payment for Travel Time to "Overnight" Project Sites**

Plaintiffs allege that in general, Radec's policy has been not to compensate its employees for certain work-related travel time that is compensable by law. Plaintiffs move for summary judgment on one aspect of this claim relating to trips requiring overnight stays.[3]

Before the Court examines the merits of this claim, some familiarity with the relevant regulation is needed. That regulation, 29 C.F.R. § 785.39, provides in pertinent part:

> **Travel away from home community.**
> Travel that keeps an employee away from home overnight is travel away from home. Travel away from home is clearly worktime when it cuts across the employee's workday. The employee is simply substituting travel for other duties. The time is not only hours worked on regular working days during normal working hours but also during the corresponding hours on nonworking days. Thus, if an employee regularly works from 9 a.m. to 5 p.m. from Monday through Friday the travel time during these hours is worktime on Saturday and Sunday as well as on the other days.

Plaintiffs have submitted affidavits of a number of current and former Radec employees who state that on occasion, Radec would ask them to travel to an out-of-town project for which an overnight stay was expected. For example, Carlos Cintron, who worked as an electrician for Radec from 1998 to 1999, states that he was asked to travel from Rochester to a "Sam's Club project in Albany for which an overnight stay was expected." Dkt. #138 ¶ 50. He states that he and his

---

[3]Plaintiffs have withdrawn another part of their motion relating to special one-day assignments. Dkt. #177 at 10.

coworkers on the project "would often travel to the worksite the morning of our scheduled workday, or the morning before, during our normal work hours," that "[i]t took about 8 hours to travel to and from the Sam's Club project," and that "[p]ursuant to [defendants'] instructions, [Cintron] did not record that time, and [he] was not paid for it." *Id.* ¶¶ 55-58.  Again, other employees have made similar allegations concerning overnight trips to various job locations.

Defendants apparently concede that it was not Radec's "practice" to compensate employees for traveling to out-of-town job sites where an overnight stay was expected.  In his deposition testimony, for example, Mark Shortino, Vice President of Radec, stated that Radec's "typical practice" was not to "pay for travel time except when an employee had already commenced work [at a particular job site] and traveled to another Radec job site [during that same day] ... ."  Dkt. #136-3 at 103.  Pursuant to that policy, he stated, Radec did not pay its employees to travel to Radec's "Covenant project" in Pittsburgh, since, once they arrived there, they worked at that location only.  *Id.* at 104.  Similarly, Raymond Shortino testified that Radec did not pay for travel time to a job site where an overnight stay was expected "[b]ecause home was the job site there."  Dkt. #167-4 at 292.  He explained that employees "weren't paid for travel hours to the project because the project, based on our policy, was home," adding, "I guess we can consider that a temporary home."  *Id.* at 293.

Defendants contend, though, that Radec did nothing improper in this regard.  The basis for this assertion is defendants' assertion that Radec employees (at least those in the relevant subclass) did not have "normal working hours," because, depending on the particular job they were working on, they might be expected to work at any hour of the day or night.  Therefore, defendants' argument

- 14 -

goes, it would have been impossible for Radec employees to have traveled out of town during "normal working hours," and, since the regulation only applies to travel that takes place "during normal working hours," the travel time at issue here is not compensable.  I am not persuaded by this argument.

Based on the record before me, I find as a matter of law that plaintiffs have established that, at least with respect to individual jobs, they did have "normal working hours," that they traveled to out-of-town job sites during those hours, and that they were not compensated for that travel time, in violation of the FLSA and 29 C.F.R. § 785.39.  Plaintiffs are therefore entitled to summary judgment on this claim.

The proof is compelling that plaintiffs, as a group, were not paid properly for travel time. First, at his deposition, Raymond Shortino conceded that, at least with respect to any given project, Radec employees did have "normal working hours."  He stated that for each project, employees "would be told for that project what their normal work hours would be."  Dkt. #167-4 at 311.  He also stated that employees' "normal work hours are the hours within a specific day that they were required to work."  *Id.* at 313.

Second, defendants have submitted a number of time records of Radec employees.  Although most of these simply show the total number of hours worked each week, some of them show what hours the employee worked each day, and in general, those hours tend to be consistent for each employee.  For instance, defendants have submitted time sheets of one David Hardy, a temporary employee who worked on the Covenant project over a five-month period in early 2002.  Those time sheets reflect that Hardy generally began work each day at 7:00 a.m. and finished at either 3:30 or

5:30 p.m.  Dkt. #175-1.  Similarly, the time sheets of David Palmer, a temporary employee who worked on the "Kodak 214 project," Dkt. #156 ¶ 68, show that from December 2000 to May 2001, he typically worked each day from 7:00 a.m. until 3:30 p.m.  On a few occasions, he left work at 1:30, 4:30 or 5:30 p.m.  Dkt. #175-2.

Third, in the affidavits submitted by plaintiffs with regard to travel to "overnight stay" job sites, the affiants state that they generally traveled to those sites during their normal working hours, or during the corresponding hours on non-working days.  *See* Dkt. ##137 ¶ 35, 138 ¶ 52, 139 ¶ 36, 145 ¶ 32, 153 ¶ 51.  Although that alone might not be enough in the face of defendants' assertions that Radec employees have no "normal working hours," when coupled with the other evidence before the Court, and particularly Raymond Shortino's implicit admission that on individual jobs there *are* "normal working hours," I find that plaintiffs have presented sufficient evidence to prevail on this claim as a matter of law.

I recognize that Raymond Shortino also testified at his deposition that "[n]ormal work hours would vary dramatically" from job to job.  Dkt. #167-4 at 311.  As an example, he stated that for a certain project at Eastman Kodak, "we weren't allowed to be in the area until 7 p.m.," after Kodak's employees had left for the day.  *Id.*

That does not mean, however, that there was no such thing as "normal working hours" for Radec employees.  Indeed, Shortino's statement itself recognizes that for any given project, there *would* be "normal working hours."  If Radec employees traveled to the site of an out-of-town project during those hours, on jobs where they were expected to stay overnight, then they were entitled to be paid for their travel time to and from those sites.

- 16 -

Defendants also contend that some Radec employees working on out-of-town jobs chose to return home (generally to the Rochester area) on weekends or the employees' off days. Defendants argue that Radec should not be required to pay for such "voluntary" travel. The evidence, however, indicates that such travel was not exactly "voluntary." Adrenne Secor, a former Radec electrician who worked on the Covenant project in Pittsburgh, testified at her deposition that "[t]here were two crews typically" on that project. Dkt. #185-5 at 55. It appears from her testimony that each crew would spend four nights in Pittsburgh, then return to Rochester. She testified that generally, her crew would leave Rochester early in the morning, arrive in Pittsburgh early in the afternoon, work for six hours, and then spend the night in a hotel at Radec's expense. The next day, the other crew would vacate the apartments where they had been staying and return to Rochester. Secor's crew would put in a ten-hour day that day, and then move into the vacated apartments. Her crew would stay in those apartments for the next three nights, then move out to make room for the other crew (which, like Secor's crew, had spent the night of its arrival in a hotel). Secor's crew would then return to Rochester for the next three nights, then leave again in the morning for Pittsburgh, and the cycle would continue. Dkt. #136-6 at 55-56, 65, #167-9 at 60, #180 Ex. B at 61-63.[4]

Secor also stated that her crew members were told that, if they chose to drive to Pittsburgh the night before the first day of their work week, Radec would not pay for their overnight accommodations. Dkt. #180 Ex. B at 62. She testified that the only time when Radec would pay both crews for their accommodations was the night of the arriving crew's first day on the job each

_____

[4]For reasons that are not apparent, the parties have chosen to submit the relevant portions of Secor's deposition transcript piecemeal as exhibits to a number of documents, making it possible, albeit unnecessarily time-consuming, to follow her testimony about these matters.

week.  For example, if Secor's crew left Rochester early Tuesday morning, and worked in Pittsburgh six hours Tuesday afternoon, Radec would pay for her crew to stay in a hotel room that night, while the other crew (which had also worked in Pittsburgh on Tuesday) spent its final night of the work week in apartments.  That was the only night of overlap for accommodations paid for by Radec, however.  *Id.* at 63.

Defendants have not rebutted this testimony, except for Raymond Shortino's assertions in his affidavit that "Radec electricians are not required to travel home on the weekends at these types of [overnight] projects" and that "Radec wanted employees to stay over the weekends so that they would not be tired from traveling."  Dkt. #156 ¶ 103.  He does not state that Radec offered to pay for housing seven nights a week on such projects, however.  Absent some concrete evidence to that effect, that is insufficient to defeat plaintiffs' motion for summary judgment on this claim.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (to survive well-founded motion for summary judgment, non-moving party must come forward with "concrete evidence from which a reasonable juror could return a verdict in his favor").  Radec may well have "wanted" its employees to stay in the vicinity of the job site throughout the project's duration, but if Radec was unwilling to back up that wish with an offer pay for its employees' housing on non-working days, the employees' decision to travel home at the conclusion of their work week cannot fairly be characterized as purely "voluntary."

Plaintiffs are therefore entitled to summary judgment on this claim.  Employees who traveled to a site during their normal working hours, whether on a working day or not, are entitled to the appropriate compensation.  At this point, however, there is insufficient evidence before the Court

to permit a determination of the precise damages to which plaintiffs are entitled.  It has not been demonstrated, for example, what each employee's normal working hours were on various projects, or the dates and times when they traveled to and from those jobs.  Absent some agreement between the parties, an award of damages on this claim will therefore have to await further proceedings either before the Court or a special master.

## C. Travel Time at Straight-Time Rates

Plaintiffs also allege that on some occasions, defendants would make an exception to their policy not to pay for travel time, and would compensate individual employees for such time. Plaintiffs allege, however, that when this happened, the employee would be paid "straight time," rather than overtime, for travel, even if the employee had worked over 40 hours that week. Defendants respond that these were "gratuitous" payments for otherwise noncompensable travel time, and therefore no particular rate of pay was required by law.

Plaintiffs are correct that compensable travel time is to be included in determining the number of hours an employee has worked in a given week.  *See Dunlop v. City Elec., Inc.*, 527 F.2d 394, 399 (5th Cir. 1976); *Kroll v. Home Depot U.S.A., Inc.*, No. Civ.A. CV202-113, 2003 WL 23332905, at *4 (S.D.Ga. Aug. 20, 2003); *cf. Smith v. Aztec Well Servicing Co.*, 321 F.Supp.2d 1234, 1236 (D.N.M. 2004) (travel time not included in overtime calculation, since on facts presented, travel time at issue was not compensable under FLSA).  There is no basis to treat travel time differently from employees' other work-related activities, and those hours count in determining whether the employee is entitled to overtime.

As the record now stands, the Court cannot determine the extent to which Radec employees were given straight-time pay for compensable travel time when that travel time, combined with the employees' compensable non-travel time, exceeded 40 hours per week.   Radec's payroll administrator did state at her deposition that if a Radec employee had worked 40 hours in a week, and traveled for an additional 5 hours, then (assuming the travel time was compensable) the employee would be compensated for 45 hours at the straight-time rate.  Dkt. #136-4 at 53-54.  If so, such a determination was improper and violated the FLSA.

There is also some evidence from Radec employees' time sheets that some travel time was compensated at straight-time rates, even if that time was in addition to the employees' 40 hours of "working" time.  *See* Dkt. #136-16.  It is impossible to determine what the nature of that travel time was, however, or whether it was in fact compensable under the FLSA.  Plaintiffs themselves describe those time sheets as simply "illustrative" of Radec's practices in this regard.  *See* Plaintiffs' Memorandum of Law (Dkt. #132) at 12 n. 5.

Accordingly, the Court grants summary judgment for plaintiffs on this claim, but only to the extent that defendants paid its employees for compensable travel time at regular rates, when that travel time, combined with the employees' compensable non-travel time, exceeded 40 hours in any given week and required compensation at "time-and-a-half" rates.  As with plaintiffs' "overnight" travel claim, the amount of plaintiffs' damages on this claim must await further proceedings.

**D. Failure to Include Bonuses in Calculating Overtime Rate**

Plaintiffs also move for summary judgment on their claim that defendants have failed to include certain alleged bonuses in calculating employees' overtime pay.  Specifically, plaintiffs contend that Radec employees were sometimes given supplemental or "project" bonuses, *i.e.*, bonuses paid upon completion of projects, and that those amounts were not included in the overtime calculation.[5]

Under the FLSA, overtime payments are to be made at the rate of 1½ times the employee's "regular rate" of pay.  29 U.S.C. § 207(a)(1).  "Regular rate" is defined "to include all remuneration for employment paid to, or on behalf of, the employee," with certain enumerated exceptions.  29 U.S.C. § 207(e).

There is no blanket rule concerning whether bonuses must be included in an employee's "regular rate."  Rather, that determination depends on whether a given bonus was discretionary. Discretionary bonuses–*i.e.*, bonuses where the employer retains discretion as to both the fact and amount of the payment–may be excluded from the regular-rate calculation.  *See* 29 C.F.R. §§ 778.208, 778.211(b); *Local 359 Gary Firefighters, AFL-CIO-CLC v. City of Gary, Indiana*, No. 2:87 CV 20, 1995 WL 934175, at *7 (N.D.Ind. Aug. 17, 1995).  On the other hand, "[w]here a bonus payment is considered a part of the regular rate at which an employee is employed, it must be included in computing his regular hourly rate of pay and overtime compensation."  29 C.F.R. § 778.209(a); *see*, *e.g.*, *Featsent v. City of Youngstown*, 70 F.3d 900, 905 (6th Cir. 1995).

---

[5]Plaintiffs have withdrawn their motion insofar as it relates to their claim that defendants failed to include daily bonuses in their "regular rate."

Here, defendants admit that Radec paid some bonuses and "supplements" to its employees, *see* Raymond Shortino Aff. (Dkt. #156) ¶¶ 139-44, but contend that these were discretionary payments that were not intended to serve as compensation for the employees' services.  I do not agree, therefore, with plaintiffs' contention that "defendants concede they failed to properly calculate their employees' overtime payments due for the supplemental (or project) bonuses ... ."  Plaintiffs' Reply Mem. (Dkt. #177) at 14.  I also find that defendants have presented enough evidence to give rise to a genuine issue of fact concerning the nature of these bonuses and whether they did fall within the exclusion for discretionary bonus payments.  Plaintiffs' motion for summary judgment on this claim is, therefore, denied.

## II. Plaintiffs' Motion for Class Certification

Plaintiffs have moved, pursuant to Rule 23 of the Federal Rules of Civil Procedure, for class certification of their claims under the New York Labor Law[6] with respect to four subclasses:  2A, consisting of employees who were not paid wages for regular or overtime work; 2B, employees who were not paid for compensable travel time; 2C, employees who allege that defendants failed to include promised per-hour pay increases in calculating their regular or overtime rate of pay; and 2D, employees who allege that Radec failed to include daily bonuses in their regular or overtime pay

---

[6]Both "[t]he FLSA and New York state labor laws entitle employees to time-and-a-half overtime for hours worked in excess of forty hours per week."  *Noble v. 93 University Place Corp.*, 303 F.Supp.2d 365, 376 (S.D.N.Y. 2003) (citing 29 U.S.C. § 207(a)(1); N.Y. Lab. L. § 160; 12 N.Y.C.R.R. § 142-2.2).  In general, New York regulations incorporate the overtime requirements of the FLSA.  *See* 12 N.Y.C.R.R. § 142-2.2.

calculation.  Defendants contend that Rule 23 certification is not appropriate in this case, for a number of reasons.

## A. Rule 23 Certification–General Standards

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  *General Tel. Co. v. Falcon*, 457 U.S. 147, 155 (1982) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)).  The class-action device is designed for cases in which the "issues involved are common to the class as a whole and when they turn on questions of law applicable in the same manner to each member of the class."  *Id.* (quoting *Califano*, 442 U.S. at 701) (internal quotation marks omitted).  In those cases, a class action can conserve the resources of both the court and the parties.  *See id.*

In order to qualify for class certification, an action must first meet the four requirements of Rule 23(a):  (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative party are typical of the claims or defenses of the class; and (4) the representative party will fairly and adequately protect the interests of the class.

If that showing is made, then the party seeking class certification must show that at least one of the three conditions set forth in Rule 23(b) have been met.  The first of those is that the prosecution of separate actions by individual class members would create a risk of either (1) inconsistent adjudications that "would establish incompatible standards of conduct for the party opposing the class," or (2) adjudications with respect to individual class members that would either

be dispositive of the interests of other, non-party class members, or substantially impair their ability to protect their interests.  Fed. R. Civ. P. 23(b)(1).

The second condition of Rule 23(b) is met when "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole ... ."  Fed. R. Civ. P. 23(b)(2).  Certification under this subsection, then, is only appropriate if at least some of the relief sought is injunctive in nature.  *See Robinson v. Metro-North Commuter R.R.*, 267 F.3d 147, 163-64 (2d Cir. 2001) (discussing standards for Rule 23(b)(2) certification), *cert. denied*, 535 U.S. 951 (2002).

The third condition is met when the court concludes that (1) questions of law or fact common to the class members predominate over any questions affecting only individual members, and (2) a class action would be superior to other available methods for the fair and efficient adjudication of the controversy.  Factors bearing on those findings include:  class members' interests in individually controlling the prosecution of separate actions; the extent and nature of any litigation concerning the controversy that has already been commenced by members of the class; whether it would be desirable to concentrate the litigation of the claims in the particular forum; and the difficulties likely to be encountered in the management of a class action.  Fed. R. Civ. P. 23(b)(3); *Kern v. Siemens Corp.*, 393 F.3d 120, 122 n. 2 (2d Cir. 2004).

In seeking certification of a class, the plaintiff bears the burden of establishing that the action satisfies these requirements.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613-14 (1997); *Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 222 F.3d 52, 58 (2d Cir. 2000).  Although the Second

Circuit has "directed district courts to apply Rule 23 according to a liberal rather than a restrictive interpretation," *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 504 (S.D.N.Y. 1996) (citing *Korn v. Franchard Corp.*, 456 F.2d 1206, 1208- 09 (2d Cir. 1972)), a court may certify a class action only if it is "satisfied, after a rigorous analysis," that the rule's prerequisites have been established. *Falcon*, 457 U.S. at 161. This analysis will inevitably be "enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id.* at 160 (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 (1978)). In some cases, it may be possible to conduct the required inquiry by looking no further than the pleadings, but in others, the court may be required to "probe behind the pleadings before coming to rest on the certification question." *Id.* In that event, it may be necessary to conduct discovery to establish a sufficient evidentiary record from which to make the class determination. *See Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 571 (2d Cir.), *cert. denied*, 459 U.S. 838 (1982).

Notwithstanding the district court's ability to look beyond the pleadings, its resolution of a class certification motion should not become "a preliminary inquiry into the merits" of the case. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974). "In determining the propriety of a class action, the question is not whether the plaintiff has stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Id.* at 178 (quoting *Miller v. Mackey Int'l*, 452 F.2d 424, 427 (5th Cir. 1971)); *see also Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 292 (2d Cir. 1999) (class plaintiffs need not demonstrate at certification stage that they will prevail on the merits), *cert. denied*, 529 U.S. 1107 (2000). In addition, in deciding whether to grant class certification, the court must assume the truth of the factual assertions contained in the

complaint.  *East Texas Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 405 (1977); *Medicare Beneficiaries' Defense Fund v. Empire Blue Cross Blue Shield*, 938 F.Supp. 1131, 1139 (E.D.N.Y. 1996).

In sum, a court considering a class certification motion "must look somewhere between the pleading and the fruit of discovery ... . [E]nough must be laid bare to let the judge survey the factual scene on a kind of sketchy relief map, leaving for later view the myriad of details that cover the terrain."  *Sirota*, 673 F.2d at 571-72 (quoting *Professional Adjusting Sys. of America, Inc. v. General Adjustment Bureau, Inc.*, 64 F.R.D. 35, 38 (S.D.N.Y. 1974)).  In undertaking its analysis, the court must also bear in mind the Second Circuit's direction to give Rule 23 "a liberal rather than a restrictive interpretation."  *Jones v. CCH-LIS Legal Information Servs.*, No. 97 CIV. 4372, 1998 WL 671446 at *1 (S.D.N.Y. Sept. 28, 1998) (citing *Korn*, 456 F.2d at 1208-09; *Green v. Wolf Corp.*, 406 F.2d 291, 298 (2d Cir. 1968), *cert. denied*, 395 U.S. 977 (1969)).

## B. Application to this Case

I find that under the standards recited above, class certification under Rule 23 is appropriate here.  First, as defendants concede, the numerosity requirement has been met, since over seventy individuals have opted into this action already.  *See Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997) (numerosity presumed at forty).  I also believe that joinder of all class members, while perhaps possible, would be impracticable.  *See, e.g.*, *Sebo v. Rubenstein*, 188 F.R.D. 310, 318 (N.D.Ill. 1999) ("The contention that joinder is possible here does not necessarily lead to the

conclusion that it would be practicable.  The court finds that joinder of the 101 class members ... is

sufficiently impracticable to meet the numerosity requirement").

The commonality and typicality requirements have also been met.  "The commonality

requirement is met if plaintiffs' grievances share a common question of law or of fact."  *Marisol A.*

*v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997) (per curiam).  Typicality "requires that the claims of

the class representatives be typical of those of the class, and is satisfied when each class member's

claim arises from the same course of events, and each class member makes similar legal arguments

to prove the defendant's liability."  *Id.* (internal quotation marks omitted).  The commonality and

typicality "requirements 'tend to merge' because '[b]oth serve as guideposts for determining whether

... the named plaintiff's claim and the class claims are so inter-related that the interests of the class

members will be fairly and adequately protected in their absence.'"  *Caridad*, 191 F.3d at 291

(quoting *General Telephone Co. v. Falcon*, 457 U.S. 147, 157 n. 13 (1982)).

Defendants argue that Mendez's claims are not typical of or in common with those of the

proposed class members, primarily because Mendez was a field manager, and as such was

responsible for scheduling, verifying and submitting employees' time and time sheets on the projects

under his supervision.  According to defendants, Mendez, unlike most of the class members, would

have to show that he did not participate in the alleged practice of unlawfully denying overtime pay.

Defendants also contend that insofar as Mendez seeks payment for out-of-town travel, his claims are

atypical as compared to those of the other class members, because most class members did not work

on out-of-town projects.

I am not persuaded by these arguments.  Mendez alleges that he was subject to the same unlawful policies as the other class members.  The fact that he had a different job title is irrelevant in terms of the typicality and commonality criteria.  *See Scholtisek v. Eldre Corp.*, 229 F.R.D. 381, 390 (W.D.N.Y. 2005) ("That these employees may have had different duties and performed different types of work is not particularly relevant to whether they are similarly situated with respect to [the named] plaintiff's claims.  What *is* important is that these employees were allegedly subject to a common practice or scheme on Eldre's part of docking salaried employees' pay in violation of the FLSA").

In addition, even if Mendez told the employees under his supervision not to report certain time, such as travel time or time in excess of 40 hours per week, based on the allegations of the complaint it appears that in doing so, Mendez would simply have been passing along directives–which he was also subject to–that he had received from above.  There does not appear to be any allegation that he in any way helped create or endorsed defendants' policies in this regard.  According to plaintiffs' allegations, Mendez no more "participated" in any Labor Law violations than did the Radec electricians who, at the direction of *their* supervisors, submitted time cards that did not reflect the actual number of hours that they had worked.  Mendez, then, like other Radec employees, simply did what he was told by his superiors.

That most class members may not have claims for travel time is also beside the point.  That is simply one component of Mendez's claims, which *is* common to those of a number of other class members.  Presumably if Mendez did not have such a claim, defendants would argue that this *lack* of a travel-time claim rendered him atypical with respect to those class members.

- 28 -

Defendants also argue that if the Court does certify a class action, defendants will raise individual defenses as to each class member's claims, resulting in "hundreds of mini-trials ... ." Defendants' Memorandum of Law (Dkt. #172) at 11.  While I agree that the necessity of numerous mini-trials generally counsels against class certification, *see*, *e.g.*, *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1253 (2d Cir. 2002), defendants have not identified what those individual defenses would be, and I am not persuaded by this conclusory assertion.  *See Scholtisek*, 229 F.R.D. at 392-93 (rejecting argument that class action would require "hundreds of mini-trials to resolve each particular employee's claims," on ground that "[t]he fact that the various class members may have had different types of job duties has little or no bearing on" the issue of whether deductions made from their salaries were permissible).

Furthermore, the Second Circuit has expressly recognized that "the fact that a defense 'may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones'" so as to make class certification inappropriate.  *In re Visa Check/MasterMoney Antitrust Litigation*, 280 F.3d 124, 139 (2d Cir. 2001) (quoting *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000)), *cert. denied*, 536 U.S. 917 (2002). In addition, to the extent that defendants may raise "individual defenses" to plaintiffs' claims, those defenses would appear to go largely to the issue of damages, since plaintiffs allege that defendants have maintained and applied certain uniform, across-the-board policies that violate the FLSA and New York Labor Law.  The only "individual" issues would seemingly relate to such matters as whether a particular class member had spent the bulk of his lunch break working, had traveled to an out-of-town job site during normal working hours, etc.  In almost any class action in which there are

- 29 -

claims for damages, though, each plaintiff must establish his entitlement to damages and the extent of those damages.  That alone does not mean that a class should not be certified.  *See Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975) ("The amount of damages is invariably an individual question and does not defeat class action treatment") (quoted in *Visa Check/Mastermoney*, 280 F.3d at 139), *cert. denied*, 429 U.S. 816 (1976); *see also Gold Strike Stamp Co. v. Christensen*, 436 F.2d 791, 796, 798 (10th Cir. 1970) ("The fact that there may have to be individual examinations on the issue of damages has never been held [to be] a bar to class actions") (quoted in *Visa Check/Mastermoney*, 280 F.3d at 139).

Defendants also contend that Mendez has not demonstrated that he can fairly and adequately represent the class, partly because he has not demonstrated that he has the financial resources to prosecute a class action.  "As a general rule however, the financial resources of a putative class representative should not preclude the representative from litigating for the putative class." *Mascol v. E & L Transp., Inc.*, No. CV-03-3343, 2005 WL 1541045, at *6 (E.D.N.Y. June 29, 2005); *see also Horton v. Goose Creek Indep. School Dist.*, 690 F.2d 470, 485 n. 26 (5th Cir. 1982) ("We reject the suggestion in the defendant's brief that a putative representative must present proof of financial resources in order to meet his burden of proof on the issue of adequacy"), *cert. denied*, 463 U.S. 1207 (1983); *Rode v. Emery Air Freight Corp.*, 76 F.R.D. 229, 230 (W.D.Pa. 1977) ("One of the major advantages of the class action suit was intended to be the increased accessibility to the judicial system for individuals of all income levels").

Defendants also contend that Mendez is not a suitable class representative because he has a conflict with respect to other class members.  This argument is essentially a variation of defendants'

assertion that Mendez's claims are not typical of the other putative class members' because he was in a supervisory position. For the reasons already given, the Court rejects that argument, as well as defendants' assertion that if a class is certified, it should be limited to employees whose situations mirror Mendez's in every respect, *i.e.*, full-time field managers who worked on out-of-town projects. A class representative's claims should be "typical" of other class members', but defendants have offered no authority that they need to be *identical*.[7]

I also find that the certification requirements of Rule 23(b)(3) have been met. As stated, plaintiffs here are challenging certain Radec policies, which allegedly have been applied in a more or less uniform fashion to Radec employees. Accordingly, these issues "are subject to generalized proof, and thus applicable to the class as a whole," and they "predominate over those issues that are subject only to individualized proof." *Visa Check/Mastermoney*, 280 F.3d at 136 (quoting *Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228, 1233 (11th Cir. 2000), *cert. denied*, 532 U.S. 919 (2001) (internal quotation marks omitted)). As explained above, some issues related to damages may require individualized proof, but that is not a basis for finding that Rule 23(b)(3)'s predominance criterion has not been met. *Visa Check/Mastermoney*, 280 F.3d at 139.

Similarly, defendants' assertion that the necessity of conducting a series of mini-trials will render a class action unmanageable is an insufficient reason for denying class certification. *See id.*

---

[7] If the Court were to adopt defendants' position in this regard, the resulting class would very likely be so small that defendants would argue that the numerosity requirement had not been met. While I do not suggest that dissimilar claims should be lumped together simply to satisfy the numerosity requirement, it would not be consistent with the purposes behind Rule 23 for a court to impose such an exacting standard of commonality and typicality that largely artificial distinctions among different employees would have the effect of winnowing down the resulting class to only a handful of potential members.

at 140 ("failure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored and should be the exception rather than the rule") (internal quotation marks omitted); *see also In re Workers' Compensation*, 130 F.R.D. 99, 110 (D.Minn. 1990) ("dismissal for management reasons is never favored"); 8 Julian O. von Kalinowski et al., *Antitrust Laws and Trade Regulations* § 166.03[3][b][iv] (2d ed. 1997) ("Generally, though, class action status will be denied on the ground of unmanageability only when it is found that efficient management is *nearly impossible*") (quoted in *Visa Check/Mastermoney*, 280 F.3d at 140).  As the Second Circuit has recognized, "[t]here are a number of management tools available to a district court to address any individualized damages issues that might arise in a class action," including bifurcation of the liability and damages phases of the trial, the appointment of a magistrate judge or special master to proceed over individual damages proceedings, decertification of the class following the liability determination, with notice to the class members how to proceed to prove damages, and the creation of subclasses (as has been done here).  *Visa Check/Mastermoney*, 280 F.3d at 141.  This "flexibility to address any individualized damages issues ... that might arise" minimizes any concerns about manageability that would otherwise exist in this case.[8]

---

[8]My conclusion that certification under Rule 23(b)(3) is appropriate renders it unnecessary for me to consider whether certification would be warranted under subsections (b)(1) or (b)(2).  *See Visa Check/Mastermoney*, 280 F.3d at 147 ("Once a court has found that a class action is maintainable under any single category [of Rule 23(b)], there is no necessity of showing that it may also be brought under any other") (quoting 8 von Kalinowski et al., *supra*, § 166.03); see also *Jefferson v. Ingersoll Int'l Inc.*, 195 F.3d 894, 898 (2d Cir. 1999) ("Rule 23(b) begins by saying that an action 'may' be maintained as a class action when the prerequisites of subdivision (a) and a part of subdivision (b) have been satisfied; it does not say that the class *must* be certified under the *first* matching section").

### III. Defendants' Motion to "Decertify" the FLSA Collective Action

Defendants have moved for an order "decertifying" plaintiffs' collective action under the FLSA, and dismissing all putative plaintiffs' FLSA claims without prejudice to the filing of individual FLSA actions.  This motion is denied.

After a collective action under the FLSA has been certified, "[t]he second phase of an FLSA collective action inquiry occurs after discovery is largely complete and 'is typically precipitated by a motion for 'decertification' by the defendant.'"  *Scott v. Aetna Services, Inc.*, 210 F.R.D. 261, 264 (D.Conn. 2002) (quoting *Mooney v. Aramco Services Co.*, 54 F.3d 1207, 1214 (5th Cir. 1995).  At this stage, the court makes a factual finding on the "similarly situated" issue, based on the record produced through discovery.  If the court finds that the claimants are similarly situated, the collective action may proceed to trial.  If the claimants are not similarly situated, the court decertifies the class, and the claims of the opt-in plaintiffs are dismissed without prejudice.  The class representatives then proceed to trial on their individual claims.  *Id.*; *Scholtisek.* 229 F.R.D. at 387.

In support of their motion, defendants rely essentially on the same arguments as those advanced in opposition to plaintiffs' motion for class certification:  that the class members are not similarly situated to each other, that defendants will rely on individualized defenses, etc.  For essentially the same reasons that I have granted plaintiffs' class certification motion, I also deny defendants' motion to decertify the FLSA claims.  I find that the class members are similarly situated in all material respects, and that this case can properly proceed as a collective action under the FLSA.

## SUMMARY

To summarize the Court's decision, then, the Court denies plaintiffs' motion for summary judgment with respect to plaintiffs' claim for compensation for lunch breaks that were interrupted or truncated by work-related activity. The Court rejects plaintiffs' contention that meal periods must be compensated unless they are completely free of any work-related interruptions. Rather, the issue is whether the meal period as a whole was spent predominantly for the employee's benefit, or for the benefit of Radec, the employer. Occasional, brief interruptions, then, will not render the meal period compensable. At this point, though, there are issues of fact concerning the nature, frequency and extent of such interruptions, which precludes the entry of summary judgment for either side on this claim.

With respect to plaintiffs' claim for payment for travel time for travel to job sites where an overnight stay was expected, summary judgment is granted to plaintiffs on the issue of liability. Class members who traveled to such job sites during their normal working hours, whether on work days or non-work days, were entitled to compensation for their travel time at the appropriate rate. Since the record clearly shows that in many instances no compensation was paid for such travel time, plaintiffs are entitled to summary judgment on the issue of liability. The calculation of damages, however, must await further proof or stipulation between the parties.

Plaintiffs are also granted summary judgment on the issue of liability with respect to their claim for pay at overtime (*i.e.*, time-and-a-half) rates for compensable travel time when an employee's total hours (including compensable travel time) exceeded 40 hours in a given week. The

undisputed evidence shows that on at least some occasions, defendants paid Radec employees for travel time at straight-time rates, even though the employee had worked over 40 hours that week. As with the overnight-travel claim, though, factual issues exist concerning the extent to which this occurred, so that the calculation of damages must await further proceedings.

Plaintiffs' motion for summary judgment on their claim that defendants improperly failed to include bonuses in calculating employees' regular rate of pay (and hence their overtime rate of pay as well) is denied.  Although the record shows that defendants did make bonus payments to Radec employees from time to time, there are issues of fact concerning whether those bonuses were discretionary, and hence properly excluded from overtime calculations.

Plaintiffs' motion to certify their claims under the New York Labor Law as a class action pursuant to Fed. R. Civ. P. 23 is granted, as to subclass 2, which consists of class members whose claims focus on defendants' alleged failure to pay any compensation, or to pay compensation at the rate required by law, for compensable time, including "regular" work time, travel time to "overnight" job sites, and meal periods which were spent predominantly for Radec's benefit.  At this point, the Court does not believe that further subdivision of this subclass is necessary.

Defendants' motion to decertify the FLSA collective action is denied, for essentially the same reasons that plaintiffs' motion to certify their Labor Law claims is granted.


**CONCLUSION**


Plaintiffs' motion for summary judgment (Dkt. #131) is granted in part and denied in part. Plaintiffs are granted summary judgment on the issue of liability as to their claims for travel to job

sites where an overnight stay was expected, and for pay at overtime rates for compensable travel time when an employee's total hours (including compensable travel time) exceeded forty (40) hours in a given week, as set forth in the body of this Decision and Order.  In all other respects, plaintiffs' motion for summary judgment is denied.

Plaintiff's motion for class certification (Dkt. #134) is granted, and a class is certified with respect to the claims under the New York Labor Law asserted by the members of Subclass 2 of the amended complaint (Dkt. #111).

Defendants' motion to decertify plaintiffs' collective action under the Fair Labor Standards Act (Dkt. #183) is denied.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
       November 22, 2005

- 36 -